UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

```
* * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,    * CRIMINAL NO. 6:24-CR-0297
                             * OCTOBER 03, 2025    9:57 A.M.
                             * SENTENCING HEARING
              Plaintiff,     *
v                            *
                             *
DEXTER WARDELL LOVETT, JR.,  * Before:
                             * HONORABLE DONALD C. COGGINS, JR.
                             * UNITED STATES DISTRICT JUDGE
              Defendant.     * DISTRICT OF SOUTH CAROLINA
* * * * * * * * * * * * * * *
```

APPEARANCES:


For the Plaintiff:        CARRIE FISHER SHERARD, AUSA
                          United States Attorneys Office
                          55 Beattie Place, Suite 700
                          Greenville, SC  29601


For the Defendant:        ANNE MARIE ODOM, ESQUIRE
                          Anne Marie Odom, Attorney at Law
                          21 Augusta Street
                          Greenville, SC  29601



              Michele E. Becker, RMR, CRR, RPR
               U.S. District Court Reporter
              250 East North Street, Room 3404
                 Greenville, SC  29601



Proceedings recorded by mechanical stenography, transcript
produced by computer-aided software.

PROCEEDINGS

(Court is called to order on Friday, the 3rd day of October, 2025, at 9:57 a.m.)

THE COURT: Please be seated. All right. Ms. Sherard.

MS. SHERARD: Good morning, Your Honor. May it please the Court? We are here in United States versus Dexter Wardell Lovett, Jr., criminal number 6:24-CR-297. Mr. Lovett is here with his attorney, Ms. Odom, for sentencing.

THE COURT: Good morning, Ms. Odom.

MS. ODOM: Good morning, Your Honor.

THE COURT: Is Mr. Lovett ready to go forward?

MS. ODOM: We are prepared to go forward, Your Honor.

THE COURT: With respect to this case, I have reviewed the indictment, the plea document, presentence investigation report, the defense motion. I've also reviewed a proposed change in the guideline range that I think relates to some potential agreements that you and the government may have with respect to some of your objections, and we'll get to that in just a few moments. And I've also reviewed the defense motion for a downward departure or variance along with a number of letters of support for Mr. Lovett that were attached to it.

Are there any other written submissions from the

defense?

MS. ODOM:  No, sir, Your Honor.

THE COURT:  Anything else from the government?

MS. SHERARD:  Nothing else from the government, Your Honor.

THE COURT:  Thank you.  Ms. Odom, with respect to the presentence investigation report, have you had sufficient time to review it with Mr. Lovett, explain it to him, and answer any questions he had concerning it?

MS. ODOM:  I have, Your Honor.

THE COURT:  And do you believe he understands it?

MS. ODOM:  I do, Your Honor.

THE COURT:  Thank you.  Madam Clerk, would you place the defendant under oath.

THE CLERK:  Sir, please raise your right hand and state your name for the record.

THE DEFENDANT:  Dexter Wardell Lovett, Jr.

(Whereupon, the defendant is duly sworn on oath.)

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Thank you, sir.  Mr. Lovett, have you had a sufficient opportunity to review the presentence investigation report in your case?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has Ms. Odom gone over it with you?

THE DEFENDANT:  Yes, sir.

THE COURT: Has she explained it to you and answered any questions you had concerning it?

THE DEFENDANT: Yes, sir.

THE COURT: Do you believe you understand it?

THE DEFENDANT: Yes, sir.

THE COURT: Do you need any additional time to either study the report or confer with Ms. Odom about it before we proceed?

THE DEFENDANT: No, sir.

THE COURT: Are you ready to proceed?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Thank you, sir.

Ms. Odom, with respect to the presentence investigation report, I note that you had indicated several objections. And as I indicated earlier in my remarks, I believe some or all of these may have been resolved or at least a proposed resolution. Let me hear from you with respect to any objections.

MS. ODOM: Your Honor, that is correct. Initially four objections were made on behalf of the defendant. At this time I believe with -- some of the ones are resolved. The only remaining objection to be left would be the two-level increase for possession of a firearm. It was the second objection made. The defense would withdraw that objection at this time.

THE COURT: All right. In order to make sure that we have a clear record, let me run through the objections. I believe your first objection was as to paragraph 118 of the report that related to the amount of marijuana that was being transported at any one time. Is that correct?

MS. ODOM: That is correct, Your Honor.

THE COURT: And then the second objection was as to paragraph 137 of the report, and that was the two-level increase regarding possession of a firearm that you just referenced, correct?

MS. ODOM: Yes, sir, Your Honor.

THE COURT: And then objection three was as to paragraph 138 of the report. That was the two-level increase for committing the offense as part of a pattern of criminal conduct that essentially indicated the defendant was engaging in that as a livelihood; is that correct?

MS. ODOM: That is correct, Your Honor.

THE COURT: And finally, objection number four was as to paragraphs 140 and 146 which in a previous version of the report I believe may have been 147. It states that you were objecting to the four-level enhancement for the aggravating role adjustment based on the defendant's role with regard to leadership in the conspiracy; is that correct?

MS. ODOM: That is correct, Your Honor.

THE COURT: All right. And the proposed resolution

with the government would cover one, three, and four, and you're withdrawing two; is that correct?

MS. ODOM: That is correct, Your Honor.

THE COURT: Now, let me make sure that we are on the same page here. With respect to count 1 -- and Ms. Sherard, I want to go through these just to make sure with regard to the proposed resolution as to those other objections that we all have the same understanding.

With respect to count 1, which is conspiracy to distribute and possess with intent to distribute marijuana, the base offense level based upon the amount of marijuana involved in this would be a 28. The firearm enhancement of two points would apply. And the defendant's role in the offense as an organizer or leader would be a two-level offense as opposed to a four-level offense and so the adjusted offense level for count 1 would be 32.

As to count 20, the conspiracy to commit money laundering, the base offense level there would be 32, the enhancement related to conviction under 18 U.S.C. Section 1956, two-level enhancement would apply. Again, the role enhancement as an organizer or leader would be the two-level enhancement and that would be an adjusted offense level of 36. Greater applies. And then the 36, if we give the defendant credit for acceptance of responsibility both for his admission of his behavior and his timely guilty plea, that's a total of

three points, so the total offense level becomes 33. And based upon a total offense level with his criminal history category of 2, his guideline range then becomes 151 to 188 months. Is that correct, Ms. Sherard?

**MS. SHERARD:** That is the government's calculation as well.

**THE COURT:** Is that correct, Ms. Odom?

**MS. ODOM:** That is correct, Your Honor.

**THE COURT:** All right. Mr. Lovett, let me ask you. Ms. Odom has negotiated three of these objections, objections one, three and four with the government. That has basically brought your total offense level down from 37 to 33, and it has brought your guideline range for imprisonment down from 235 to 293 months imprisonment to 151 to 188 months imprisonment. Do you understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And do you want me to approve that proposed resolution negotiated by your attorney with the government?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** All right, sir. In addition to that, Ms. Odom tells me that with that change you're willing to withdraw your objection number two to the firearm enhancement. Is that correct?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Do you need any additional time to talk with Ms. Odom about any of these objections with respect to how they're being resolved?

**THE DEFENDANT:** No, sir.

**THE COURT:** All right. Understanding the facts of the case, I find that the proposed resolution by the parties for the three stated objections is reasonable and the Court will accept that. The Court also finds that the defendant is knowingly consenting to the resolution of the objections in this manner including the withdrawal of objection number two as to the firearm enhancement with respect to, I believe it's count 1.

All right. Any other objections from the defense?

**MS. ODOM:** No, sir, Your Honor.

**THE COURT:** Any other objections from the government?

**MS. SHERARD:** No, Your Honor.

**THE COURT:** All right. Consistent with the Court's ruling regarding the objections and the change in the offense level and guideline range as stated, the Court will adopt the presentence investigation report as the finding of facts for purposes of this hearing, and the record will so reflect.

Now, with respect to the statutory provisions and guideline provisions applicable in this case, Mr. Lovett pled guilty to count 1 which, again, is for conspiracy to

distribute and possession with intent to distribute marijuana in violation of Title 21 United States Code Sections 841(a)(1), 841(b)(1)(B), and 846. And also count 20, conspiracy to commit money laundering in violation of Title 18 United States Code Section 956(a)(1)(A)(i). The statutory provisions and guideline provisions applicable in this case would reflect with respect to the statute as to count 1, a period of imprisonment of no less than five and no more than 40 years, and as to count 20, not more than 20 years. Supervised release as to count 1, at least four years, and as to count 20, not more than three years. The defendant is statutorily ineligible for a probationary sentence.

The guideline -- excuse me. The statute provides for a fine as to count 1 of $5 million, as to count 20, $500,000. So a total of $5,500,000. There is a special assessment fee of $100 for each count for a total of $200. The guideline provisions as modified by the resolution of the objections reflect a total offense level of 33, criminal history category of 2. Again, he's ineligible for probation. His guideline range for imprisonment would be 151 to 188 months, four years supervised release. No fine has been calculated due to inability to pay. Restitution is not applicable in this case. And there is the 200-dollar mandatory special assessment fee.

Are there any objections or exceptions to the

Court's statement of the applicable statutory and guideline provisions in this case from the government?

MS. SHERARD: No, Your Honor.

THE COURT: Any from the defense?

MS. ODOM: No, sir, Your Honor.

THE COURT: All right. With respect to that, at this point I think what I'm going to do, Ms. Sherard, is I'll hear from the government first.

And Ms. Odom, when I come to you I'll hear from you on your motion as well as any 3553(a) factors arguments you want to make in addition to that.

And then Ms. Sherard, to the extent necessary, I'll give you an opportunity to respond to the motion.

Ms. Sherard, I'll hear from the government first.

MS. SHERARD: Certainly, Your Honor. May it please the Court? I know this is not new to Your Honor. I believe Mr. Lovett is the last defendant in this conspiracy to be sentenced, so I know Your Honor has a good picture of the case and what this looks like. But also I know Your Honor has heard me say this before, this is not our first marijuana and drug conspiracy and money laundering conspiracy before Your Honor. This office has had many. Because over the past five plus years the upstate has seen a growth of illegal marijuana distribution businesses. And part of this of course is because they are very lucrative. Many drug dealers believe

that they can distribute marijuana with ease because it carries less risk when it comes to the penalties associated with it and that it's somehow less dangerous. But in reality marijuana here in the upstate has and continues to fuel this undercurrent of criminal activity which is very serious and very dangerous. And so from a community perspective whether you're talking about marijuana, or cocaine, or, you know, methamphetamine, it can be very very destructive much like those other drugs. But for other reasons and for many of those reasons we saw them in this case because this is, of course, while the charges are drugs and money laundering to which Mr. Lovett pled guilty, and looking at his other co-defendants in their cases as well similarly situated, it is also a gang case, and this is because the drug trade fuels gangs and the illegal activity and the violent activity that they are associated with.

And of course, it goes without saying and, again, this is not about Mr. Lovett specifically, but of course in this case members of the gang and others have been killed and injured. It is very violent and, again, is fueled by the marijuana drug trade. All of these things are important when looking at the case as a whole because, again, I know sometimes people think, oh, it's marijuana, it's not that serious. But it is. It's also extraordinarily lucrative as I mentioned earlier. Even under the adjusted base offense level

when I believe the government conceded rather than the 30 pounds of marijuana, I think Ms. Odom mentioned maybe 25 is more reasonable. I think a prior prosecutor may be even went as low as 20. Just taking the number 20, according to the PSR which I guess has not been objected to, it looks like there's about 78 trips to California at 20 pounds of marijuana. That yields 1,560 pounds of marijuana for this defendant.

And then if you turn to paragraph 73 of the PSR, you'll see that there is iCloud information that was extracted from Mr. Lovett's iCloud, and it references just for perspective an order for 32 pounds of marijuana to the California west coast supplier, and that cost was $29,850. Thus, if you do the math, that's about $900 a pound. So if you multiply $900 a pound times the 1,560 pounds in this case, you see that the cost basis for this marijuana just to bring that marijuana back, that that's $1.4 million. $1.4 million during the window of this conspiracy. That is significant for this defendant.

And so it was -- certainly in many eyes they saw it as low risk and high reward. Well, there certainly was high reward. But it is serious conduct. That's why the government prosecuted this case. One of the many reasons that it breeds -- this type of money breeds other activity, because as we all know, if you have no less than $1.4 million, because presumably we're selling it, he being the defendant is selling

it for more than $900 a pound, you know you've got more money than just the 1.4. But we know he had 1.4 to buy that much marijuana, thereabouts. But once you do that, then you have all these ill gotten gains, so to speak. And the question is, what do you do with that? This is your livelihood. What do you do? That's where the money laundering comes in to play here. And that's why money laundering was a portion of this case because you have to deal with this amount of money. It is being utilized and concealed and used to promote the underlying crime here, the drug trafficking, moving forward for a period of years. And we certainly see that here. And, you know, I know we've adjusted the guidelines. And the new range I think is an accurate reflection of the conduct here. It is just punishment for the crimes that have been committed, both the drug trafficking and the money laundering. Those are two sides of the same coin.

And with that, and looking at it, not just the drug trafficking, but also the money laundering with Mr. Lovett, it wasn't just him. In order to carry out not just the drug trade, you know, where he needed couriers to bring it back and forth, but on the money laundering other individuals, other co-conspirators were also utilized by Mr. Lovett. You know, I mean, to carry this out, you know, there were false, I believe, wage statements submitted for the purchase of items, for the procurement of a high end condo in Greenville. There

was identity theft with a co-defendant in order to do so. Use of third parties, you know, on titles to vehicles and whatnot. Again, using his wife and other members of the conspiracy.

So, I say all that to say, I think that the guidelines in this case have done a good job of presenting the picture of the crime here, the drug trafficking and then also the money laundering. And with that in mind it is the government's position that a low end of the guideline sentence would be appropriate, the 151 months. I certainly would give the defendant credit. He has been out on bond for quite some time now, and to the best of my knowledge he has not had any issues. And I think that goes a long way to say that he is hopefully headed towards the path of rehabilitation and the government certainly acknowledges that.

But all that to say, in addition, looking at the history and characteristics of the defendant, we do believe that that 151 is the right number in this case, in part because he committed this while he was out on state probation in part. You know, during -- excuse me. I don't have that number in front of me, but I believe in his criminal history we can see that he received a YOA, I think a YOA sentence and then probation. Sorry. Paragraph 126 contains that. So we see that he was committing this offense while out on a state offense. So he's had that opportunity with the state to correct his course of conduct, and that didn't occur. His

probation ended in 2021 on that offense, and that was his wake-up call. Unfortunately he didn't take it, and here we are today with this 151 to 188 sentence.

Also looking at some of the other co-defendants in this case, obviously one defendant was at the higher end at 215 months. And then others received I believe probation or time served in this sentence. And it does seem like Mr. Lovett in his position within the conspiracy sort of fits squarely between those two ranges. And this is a situation where the guidelines have accurately accounted for his position within the conspiracy and they have come out as such. So, that is the government's position. We think that the facts within the PSR and the circumstances of this case render a low end of the guideline range sentence in the government's eyes.

THE COURT: Let me ask you this, Ms. Sherard. With respect to paragraph 131, at the time the PSR was completed, the defendant had a pending charge in Greenville. I think it's a vehicular charge, reckless driving, failure to stop for a blue light. Do you know if those have been resolved? Ms. Odom, you can chime in if you know.

MS. ODOM: Your Honor, I do know Grace Moroney with the Solicitor's Office dismissed those charges a number of months ago. Those are no longer pending at this time.

THE COURT: Just wanted to make sure those had been

taken care of. Thank you.

MS. SHERARD: Thank you, Ms. Odom.

THE COURT: Ms. Odom, I'll be happy to hear from you.

MS. ODOM: Thank you, Your Honor. May it please the Court? Obviously our position is that the -- while appropriately calculated guidelines range of 151 to 188 months is greater than necessary to both punish Mr. Lovett for the conduct to which he has pled guilty to, but also for what the conduct itself is. And to give him a chance for his future going forward there, I'm going to touch on a couple of things that I filed in my variance motion, but for the most part I'm going to rest on what is in that written motion with the Court. But there are a few things that I would like to draw the Court's attention to. Then at the appropriate time there are three people here today on behalf of Mr. Lovett. So when I am done speaking, I believe only one of those gentlemen intends to address the Court, but he does have a co-worker, a pastor, and then a very dear family friend who also wrote a letter here today. Just wanted to let the Court know that in advance.

Judge, we believe as it relates to the guidelines calculations, and Ms. Sherard and Ms. Coleman with the U.S. Probation Office know they have both done an exceptional job. Those are the correct guidelines. It is our belief that while

money laundering is obviously a big part of this case and those guidelines bring us to a point that is that 151 to 188 range, at the end of the day this conspiracy as a whole, and Mr. Lovett was in the third round of indictments in this, so Your Honor has been dealing with tangentially people related to this case for the better part of the last couple of years, I believe the last three years.

This is a drug conspiracy case at its heart. Whether or not money laundering is charged by the government, I would venture to say at least in my work as a defense attorney that most drug dealing does involve some money laundering. Would I absolutely concede that what Ms. Sherard said about some of what occurred in this case specifically may rise to the level above what some of your average money laundering is? Yes, sir. I do. I believe that. My client would admit to that. I understand it is why he entered a guilty plea to it. He was absolutely guilty and from day one when we met and we talked about here is what the indictment says, here is what they said you did, he was incredibly forthright with what he did do and what he didn't do. And I told him then, you know, you are going to have to attone for the sins that, you know, that you have made, and you are going to pay a price for those.

But, Judge, we do believe that a guidelines range more in the 97 to 121 months, which is where the drug count

would come out to, is a little bit more reflective of a starting point for a variance, again, with the acknowledgment that we do believe the guidelines are appropriately calculated. He is being hit essentially with a double whammy. So in these money laundering guidelines the leadership enhancement, you know, he is dealing with that on the drug side. But then that is coming in to play twice. And while it is not technically double counting, he is certainly getting a significantly harsher penalty. There is almost a five-year swing between 97 and 121 months, and 151 to 188 months. So there is a big difference there in kind of where the appropriate starting point is.

But Judge, I would incorporate that as a potential argument for a variance as opposed to anything related to the guidelines calculation. I think more important than that, and a few things I wanted to touch on for Mr. Lovett, Judge, he's 27 years old and, you know, we've all been 27. I would say most of your 20s you spend being in your 20s feeling like you have a pretty good idea that you know what life is about and then as you get into your 30s or your 40s or your 50s, with each decade you kind of recognize that, man, I really didn't know what I was doing, or those were really -- that was not a good decision. And one of the, you know, blessings and curses of being young is that if there was ever a time in your life to make mistakes, and I certainly don't condone the ones that

he has made, but much better to make that as a young man with your future in front of you and to get on the right track. And I know Ms. Sherard mentioned conduct since he has been on bond. Obviously there is nothing I can say or he can say that changes what he did and why he is here. But I have to commend him. And I know Kevin Kennedy who is his supervising agent, I've spoken with a number of times over the course of this case. I talked to him yesterday. He has been outstanding on supervision. He has spent 485 days I believe as of today with not one failed drug test, not one monitor violation. The only request for the most part that he has made of the Court to do anything outside of going to work and being with his family has been to travel to Charlotte where his almost six-year-old little girl goes to school during the week and then comes back to Spartanburg with him on the weekends. So he is just someone that, you know, has shown us through his conduct since he was charged that he is capable of doing right and living right. And I know that this is something he's going to touch on. But Judge, there is a provision.

The Sentencing Commission put out the policy statement about age and people who are young and, you know, the curve that we make poor decisions more often when we are youthful, when our frontal cortex is not completely formed. He has made some really bad decisions. And, again, it's not only because of his age, but is that certainly a factor?

Absolutely. Like I said, I do think it benefits him that as devastating as you know this is and as today is and as the result of today will have been, no matter what happens today he does have a future in front of him. The beauty of being a young man of 27 is that you do still have life in front of you and you do still have a chance to turn your life around.

Judge, he is obviously a low criminal history. That is something that he is a category 2. I believe Ms. Sherard referenced those prior convictions. And like I said, that charge, failure to stop in Greenville, has been dismissed by the solicitor's office. But he does not thankfully have much of a criminal history. That obviously places him in a group that is less likely to recidivate. It also means that he has never spent, but for the time he spent in jail when arrested on this indictment initially, that is the longest he has ever spent in prison or in jail. He has never been to prison. The result of today will be the first time he has ever gone to prison. And this Court has heard me make this argument, and perhaps I've been in a unique situation as a defense attorney in the last year that I've had a couple of people in front of Your Honor in the last six or nine months who have never been to prison before. And that is something that, you know, occasionally I get the question when somebody is meeting with me, have you ever been to jail? No. Thank goodness, no, I have not. I do not want to go. But it is not lost on me that

I cannot fathom what a day being in jail or prison would look like. And it is very easy sometimes I think in this line of work to talk about people's lives in terms of months or years. And, you know, we get so accustomed to doing this as a living, throwing that around of, you know, this many months or ten years. Oh, well, you know, seven years. 365 days. One year is more than I can possibly wrap my head around. One year in prison for someone who has never been is more than I think most of us could truly fathom what that would be like. One year away from your family. One year away from your children.

I have kids close in age to Mr. Lovett's child, and I was thinking last night as I was laying in bed, again, knowing that on a personal level that this day is coming for him. My middle child is a little bit older than his daughter. And I cannot imagine what it was like to go to bed last night and wake up this morning and know that because of your own actions, because of no one but him, not because of me, not because of Ms. Sherard, not because of anyone in this courtroom, because of his own actions those precious years that I am living with my kid and my family while they are in the little years and they still really care about mom and dad, like, he is going to miss those. There is no scenario where he doesn't. And I know that if there is a lesson that he has learned in all of this and a motivation for him going forward, it has been knowing how important, like I said, there's some

changes that he made in his life after his daughter was born. Those changes, you know, have manifested further since he has been caught, arrested, charged, indictment, pled guilty. But that has shaped, and it is alluded to in some of the letters from the Court, I think his view on a lot of the life that he had been leading and decisions that he made as a late teenager in his early 20s and kind of what he thought life was about and what success meant, what really making it, what mattered, that changed. And it should. And I am -- as much as I hate that he is in this situation, I truly as someone who has known him since he was younger and has walked him through this case, I hope that he does use this opportunity and that whatever sentence the Court hands down today, that he does completely -- he's taken some steps in the right direction, but that he does completely turn his life around. Because I know how much his little girl means to him. And I know what she deserves. And I know that he wants to be there for her.

Judge, we touched a little bit in the variance motion on his daughter. And I know he will speak. He's got a fairly short statement to read to the Court, and I'll wrap up here shortly. But she is his world. Again, I think the Court is aware that I have three sons so, you know, as we're talking about kids and talking about youthfulness and all of these things, I'm looking ahead thinking about my, you know, my own boys when I'm representing a young man standing beside me.

But I know how much I've changed as a parent, and I know how life altering of a gift that is for somebody. And I think it has grounded him and forced him to make some decisions even prior to and outside of all of this in changing some of the ways that he is living his life, like I said, and giving him the motivation going forward to not get back involved in this. I thought Ms. Sherard did a beautiful job in saying that I think out in communities sometimes there is a sense, particularly in the drug trafficking world about marijuana. And I think she used the term, you know, "low risk, high reward." I would certainly say from my side of the aisle in doing this, I do think that's a common misconception out there. But there is -- he has learned the hard way. There is absolutely nothing, there is no amount of money over the course of several years that you may have made, there is no trip you went on, there is no car you bought, there is no nice apartment you were living in that is possibly worth any of this and that is worth what is to come. And that is a lesson that nobody can tell you. You've got to live that yourself. You've got to live and learn it yourself.

And Judge, the last two things that I'd like to bring up with the Court, I know the Court is very fully aware, one of the 3553(a) factors being the need to avoid unwarranted sentencing disparities. I referenced in my motion a case that I used that client's initials, but a case where that defendant

was charged, very similar circumstances, bringing marijuana from California and facilitating people to do that. There are also a number of firearms that defendant pled to, a 924(c). I do think that case was illustrative of just because the guidelines put you at a certain point does not mean that that is just, that that is fair, that that is the appropriate sentence. And if you do the things that you need to do, there are more appropriate sentences that are sufficient but not greater than necessary.

And lastly, Your Honor, to close, I would point the Court to the United States Sentencing Commission 2024, a couple of statistics. And I referenced this in my motion that across the United States, in 2024 the average reduction for a marijuana trafficking case on a variance or departure was 49 percent. As it relates to money laundering, the average reduction was 48 percent in 2024. As I run some of those numbers, were you to take 97 months as a starting point with a 49 percent reduction, that would come out to 49.47 months. Were you to use 151 as a starting point and reduce it by 49 percent which, again, was the national average last year, that would be 73.99 months. And Judge, the average marijuana trafficking sentence across all districts for 2024 was 37 months. Again, as Ms. Sherard said, every case is unique. It is not as simple as those numbers that I just said. But I feel compelled to point those specific numbers out to the

Court. And I would respectfully ask the Court to consider a 60-month sentence in this case. I do believe that five years in prison is a lot of time for a 27-year-old man who while he has committed crimes, has done things wrong, he has started -- I'm not going to say he's completely learned his lesson because I don't know that I believe that's true. I'm never going to stand in front of you and say something. But I think he is well on his way. And with the recognition that he's going to have a lot of days and a lot of nights staring at four walls around him thinking about what got him there, and if he ever wants to come back. So respectfully we would request the Court to impose a 60-month sentence. Thank you, Your Honor.

THE COURT: All right. Ms. Sherard, I'll give you the opportunity to respond.

MS. SHERARD: Your Honor, just briefly. I just want to highlight a couple of things. First, of course, Your Honor sentences not just the defendant but the crimes he committed. I do think it would be -- while the Court has broad discretion to vary for any number of reasons, I do think it is a dangerous road to go down to start varying because of an argument that the defendant's culpability is really one offense of conviction as opposed to the other. I think that's a very dangerous road to go down. This is not the only case that Your Honor has or that the Court has. We routinely see

people in these very same circumstances. The money laundering calculations are always as applied as calculated, and sometimes those are higher than the drug conviction -- the drug basis, and sometimes they're not. I went back and pulled some other cases yesterday just to take a look and confirm my suspicions, and they were the same. And I believe in those cases any variance that was granted was not done so in a basis of disregarding the money laundering. So, I do think that's a dangerous road under a variance. And certainly that would present unwarranted sentencing disparities as much as anything else.

We do not believe that he is the picture of the lowest possible defendant at a 60-month sentence. That's in essence what the defense is asking for. They're saying that he deserves the bare minimum that Congress says in this case. And I do not believe we are there. The idea that somebody who has been responsible for over a million dollars of marijuana here in the upstate and at such a young age obviously is very bright and certainly could have put his mind to use in other ways. We just -- I find that to be an odd -- that seems incongruent for someone to receive the statutory lowest minimum sentence for such conduct.

So, again, with respect to that we think that 151 sentence is appropriate today. And, again, the leadership enhancement as I touched on earlier is applied in the money

laundering because much of what he was doing involved many other people in order to carry out his crime, be it the drug dealing or the money laundering. It involved the use of others. He needed other people. He recruited them. They were part of the conspiracy that he could not have carried out without the assistance of those individuals. So I think that's rightly earned under the money laundering and under the drug offenses. So, all that to say, we do believe that that low end of the guidelines, the adjusted guidelines of 151 takes into account everything related to Mr. Lovett's conviction and his unique circumstances, the history and characteristics of it.

**THE COURT:** All right. Ms. Odom, I believe you said that there were some people who wanted to address the Court?

**MS. ODOM:** That is correct, Your Honor. I believe his co-worker, Mr. Best, would like to address the Court.

**THE COURT:** Okay. Thank you, sir. Mr. Best, if you'll come up here to the podium. I'll ask the clerk to place you under oath, then I'll be happy to hear from you.

**THE CLERK:** Sir, please raise you right hand and state your name for the record.

**THE WITNESS:** Ronald P. Best.

(Whereupon, the witness is duly sworn on oath.)

**THE WITNESS:** Yes.

**THE COURT:** All right, sir.

**THE WITNESS:** I was a co-worker with Dexter, which I will say was more than a co-worker because we became family and friends, working with him we started at the same time. Noticed him. He kind of stood out. Well respectful, you know. Everybody kind of took to him. You know how these kids act today, some of them don't have a lot of respect. I really took to him. And during that process working together he helped me out a lot. He helped everybody out a lot. Due to some things that where he started to get sick, he ended up going to another place. But we still carried on as a family. Like I said, he talked to me about what he had done. And just watching him, he was sincere that, you know, he wasn't going to get into no trouble. He wasn't troublesome. Sometimes, Judge, we get caught up as young kids. That's one of the reasons why I'm here speaking for him today. I didn't want to write a letter. I wanted to come be here for him because we've been there for each other since then. We keep in touch all the time, like I said. We've had Fourth of July dinners together. He is a family man. Loves his little girl, his girlfriend mama. Close knit. And we've all been together, fellowship together. And like I said today, I know I don't get but a little bit of time, but I could talk about Dexter all day. How he got in to what he got into, I don't know. But the kind of young man that he is, he is an asset to us, not a liability. And I wanted to come speak for him today

because I think he deserved that.  Like I said, he's been going through a lot, and we've been talking, but we're here today to settle everything.  And whatever I can do to help him, I'm here.

THE COURT:  All right.  Thank you, sir.

All right.  Ms. Odom, anyone else?

MS. ODOM:  Your Honor, I believe Mr. Lovett is the only other person who wishes to address the Court.

THE COURT:  Mr. Lovett, you have the right to address the Court before I make a final decision about your case.  You're not obligated to say anything, but if there's anything you want to tell me about yourself, about this situation, circumstances, anything that you think is important for me to know about, I'll be happy to hear from you.

THE DEFENDANT:  Yes, sir.  I want to first start by apologizing to the Court for the actions and mistakes I've made that led us here.  I take full responsibility and accountability of my actions.  Second, I want to apologize to my loved ones for placing myself in a situation.  I've learned a lot from the situation.  Lessons I will carry with me for the rest of my life.  This situation has helped me.  I know through the process I've learned humility is essential.  I know I have not seen the end of the tunnel, but I know I can get there.  I look forward being a positive role model in my community, law abiding, tax paying citizen.  I ask mercy from

the Court as I'm not the same person. My goals are to be an active father and watch my daughter grow, lead by example, and be a role model not just for her but for others in my community.

THE COURT: All right, sir. Thank you.

Ms. Odom, anything else?

MS. ODOM: Nothing further from the defense, Your Honor.

THE COURT: Ms. Sherard?

MS. SHERARD: No, Your Honor. Thank you.

THE COURT: All right. I note that we have a number of folks with us here today, and I would anticipate that based upon my having done this a time or two, that most of them are likely here on behalf of Mr. Lovett. And Mr. Lovett, that speaks well of you. For their benefit I want to talk a little bit about how sentencing works in the federal court and how it works in this case.

Obviously as I went over earlier, there are certain statutory provisions that Congress has passed that the Court has to sentence consistent with. There are also guidelines that the United States Sentencing Guidelines Commission have adopted for various offenses, and we use those guidelines to determine based on the offense level and the defendant's criminal history category a guideline range of imprisonment that complies with the statutory requirement but is based upon

those guidelines somewhat more customized to the particular crime and defendant before the Court. Once we have accurately calculated the guidelines that apply in the case, then the Court is required to determine whether or not there's any legal reason or guideline reason for granting a departure either up or down, or granting a variance based on the facts and circumstances of the case, again, either up or down.

In this case the defendant has filed a motion seeking a downward departure or a downward variance, and I will state for the record that I do not find in this case a basis for a downward departure. I do want to talk about downward variance. And the parties have agreed and based upon my review of the information provided by the probation department with regard to the offense levels and adjustments as applied to the facts in this case, I do find that the guideline range of 151 to 188 months is the appropriate place to start. With respect to the motion for downward variance, the defense has raised both in the written and in the argument today several matters that I want to make sure that I address. The first is the defendant's background and upbringing, what we typically refer to as a lack of youthful guidance. Also, his age, his youthful age, and defense counsel made reference to certain studies and findings with regard to development of I think the studies talk about the development of the youthful brain. I prefer to take it as development of judgment by

people at a young age. Defense has also raised the defendant's coming of age in a culture of drugs and addiction, and finally the defense has raised his family responsibilities that he has as a father with a young child. And in addition to those items that were raised, in the written motion and touched on today, defense has also raised issues related to whether or not the facts of the case support the nature of the charges and the effect of those charges and the application of the guidelines to the range of sentencing, specifically as was discussed earlier, whether this is at its essence just a drug distribution case or whether there is a significant component with regard to the money laundering charge.

In determining whether or not there is a basis under any of those arguments or any others for a variance in this case, the Court is required to consider certain factors that Congress has set out in statute, and those factors are found in Title 18 United States Code Section3553(a). For those in attendance, when you hear the attorneys or the Court refer to the 3553(a) factors, that's what I'm talking about. And roughly speaking in this case, those include first and foremost the nature of the offense, the seriousness of the offense, the need for just punishment for the offense. Secondly, the nature and characteristics, the history and characteristics of the defendant which involves not only his criminal history but his background, his family history, his

educational background, his employment background, his health both physical and mental, any history of addiction, those type of things. The Court also has to make sure that any sentence that is imposed is one that is sufficient to try to instill in the defendant a respect for the law and to deter not only this defendant but others who might know about this case or be tempted to engage in the same conduct to deter them from such conduct in the future. A sentence sufficient to protect the public from any future crimes of the defendant. A sentence that takes into account any necessary medical or rehabilitative services that the defendant might be in need of and how to most efficiently provide these, the types of sentences that are available to the Court. And finally, as has been referenced previously, the Court has to fashion a sentence that does not constitute an unwanted disparity with similarly situated defendants in the sentences that they have received. That is particularly important in a case like this where we're dealing with a conspiracy case, but it extends not just to co-defendants in this case, but across the board as counsel has made arguments related to these types of cases generally.

Now, with respect to my having considered those things, I do find that there is a substantial ground for consideration of a variance based upon the defendant's youth, relative youth, and his lack of youthful guidance. And I

specifically note that in this case not only is there evidence in the presentence report with regard to the defendant's upbringing, a lack of youthful guidance, I note that his parents were co-defendants in this case and actually participated in at least the money laundering aspect of this case which is an extremely unusual situation. With respect to the argument about the defendant having been raised in a community and a culture where this type of behavior was not all that uncommon, I tend to think that goes part and parcel with the first two aspects, his youth and lack of youthful guidance both growing up and apparently even after he got involved in this with regard to his parents. With respect to his family responsibilities for his child, I certainly don't want to minimize that, but that's something that is common to many defendants that come before the Court unfortunately.

With respect to the argument about this is at its core primarily a drug distribution case, I can't go that far. This is one of the most elaborate, complex, and sophisticated money laundering cases with regard to distribution of marijuana that has come in front of this Court. As was referenced by the prosecutor, there were fake paychecks, there were fraudulent or hidden apartment leases in terms of who the true lessee was. There were transactions involving automobiles, and we're not talking about Volkswagens or Kias. We're taking about Corvettes and Audis. We're talking about

significant amounts of money being moved around. In fact, one of the co-defendants was essentially a fraudster who helped facilitate the defendant's fraudulent transactions as part of this complex money laundering scheme. So I think the money laundering piece is a significant part of this case under these facts.

I also want to touch on with regard to the nature of the offense and the seriousness of it, a recognition that what counsel says about marijuana is typically true, and that's because if you typically think of somebody who's buying some marijuana off the street and they're rolling a joint, the effect upon them is not nearly what it can be if they're taking a Fentanyl pill or if they're shooting up with heroin. Those things are just as likely as not to kill you one time you do it. Marijuana is obviously not that same type of drug. We also know that in many states across this country marijuana has been legalized both medically and recreationally. So clearly it's a different type of drug. But it's not the marijuana that is the problem here. It is the trafficking of the marijuana. It is the marijuana trade. And that trade is extremely lucrative. And where there is large amounts of money, violence is likely to follow. We have a firearm enhancement in this case regarding the defendant's possession of a firearm. There are several of his co-defendants in this conspiracy who also had firearms with them. Reference was

made to gang activity. And based upon the information in the presence report, the defendant has acknowledged that he was a member of a gang at least at some point in his life. There may be a difference of opinion between him and the government as to when that gang activity ended, but he acknowledges that at least at some point he was part of a gang. There are co-defendants in this case who were gang members who were present at locations where violence occurred, where shootings occurred. There is a strong inference that I think is proper for the Court to draw that these folks were carrying firearms here including this defendant had possession of a firearm because of the amount of money involved in this enterprise and the need that he felt to protect himself and his profits, his business, and that's where the real danger is.

If you want to read your history, go back less than a hundred years ago to the time of prohibition and you can see what the trafficking of contraband and how violence goes hand in hand. Same thing is true here. And while marijuana we can argue about whether it is more dangerous or less dangerous than alcohol, there are lots of studies and reports out there that you can read if you're interested in that sort of thing. I think we could all agree that neither of those is likely to kill you the first time you smoke a joint or the first time you take a drink. But the trafficking, the illicit trafficking of both has resulted in a lot of violence, and

that's why these folks carry guns, and that's why the trafficking part is much more concerning to this Court than if we had just somebody who was an addict and they were selling a little weed to support their habit. It's not the same thing.

All of that said, with respect to Mr. Lovett, both from what is contained in the presentence report and what was raised in the letters that were attached to the defense motion which I have read each one, and testimony we heard this morning from Mr. Best, Mr. Lovett clearly has a lot of potential. He is a very intelligent person. He has some college attendance, I believe, if I recall correctly. He obviously was very intelligent setting up all of this that brings us here today. You can be brilliant at business administration and use it for an illicit purpose, but you can also use it for a legitimate purpose. And he obviously has talent and ability in that regard. He obviously has many good qualities that his friends and family members recognize and have seen in him throughout the years. And so this is a situation where I don't believe that we're talking about somebody even though he may have been the, to use a expression, the kingpin of this conspiracy, I don't think we're talking about somebody who needs to be segregated from society for an inordinate amount of time in order to meet the policy requirements and the purposes of sentencing and to fashion a sentence that is sufficient but not greater than

necessary to achieve those purposes.

That said, I do believe contrary to Ms. Odom's argument that the money laundering piece of this is significant in this case. This is not simply a distribution of marijuana case. Also have to take into account similar sentences of similar cases with defendants who have been sentenced both in connection with this conspiracy and others. And I will state for the record that with regard to the money laundering, this is one of the top two or three that I have seen in my time on the bench in terms of its complexity and its sophistication. So, after having said all of that, I'm going to grant the defendant's motion for a downward variance below the guideline range of 151 to 188 months, although I am not going to grant it to nearly the extent requested by the defense.

All right. After having calculated and considered the advisory sentencing guidelines and having also considered the relevant statutory sentencing factors contained in Title 18 United States Code Section 3553(a), it is the judgment of the Court that the defendant, Dexter Wardell Lovett, Jr., is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a period of 102 months. This term consists of 102 months as to counts 1 and 20. All such terms to run concurrently. It appears the defendant does not have the ability to pay a fine, therefore the fine is waived. The

defendant shall pay the mandatory 100-dollar special assessment fee for each count for a total of $200.

Upon his release from imprisonment the defendant shall be placed on supervised release for a term of four years. This term consists of four years as to count 1 and three years as to count 20. All such terms to run concurrently. While he is on supervised release the defendant shall comply with the mandatory conditions of supervision as outlined in Title 18 United States Code Section 3583(d) and United States Sentencing Guidelines Section 5D1.3(a), as well as the standard for discretionary conditions outlined in United States Sentencing Guidelines Section 5D1.3(c), all as noted in paragraphs 177 and 180 of the presentence report, which paragraphs are specifically incorporated by reference herein. Standard conditions of supervision 1 through 9 and 13 serve the statutory sentencing purposes of public protection and rehabilitation pursuant to 18 U.S.C. Section 3553(A)(2)(C) and (D). Standard conditions of supervision 10 and 12 serves the statutory sentencing purpose of public protection pursuant to 18 U.S.C. Section 3553(a)(2)(C). Standard condition of supervision 11 ensures that the defendant does not engage in activities that may potentially conflict with the other conditions of supervision and that may pose risk to the defendant's probation officer.

The defendant shall also comply with the following

special conditions for the reasons set forth in the presentence report, which has previously been adopted by this Court as the finding of facts for purposes of this sentencing hearing. Those special conditions are as follows: Number one, you must submit to periodic substance abuse testing up to two times per week during the term of supervised release to determine if you have used a prohibited substance. This is being ordered based upon your history of drug abuse in order to help encourage your abstinence from the use of illegal drugs, and this condition will set the maximum number of nontreatment program related drug tests to which the defendant may be subjected during his term of supervised release. Number two, you must contribute to the cost of any testing or treatment programs not to exceed the amount deemed reasonable by the court-approved United States Probation Office's sliding scale for services, and you must cooperate in securing applicable third-party payment such as private insurance or Medicaid. This is being ordered in an effort to help offset government testing and treatment expenses, but more importantly also it's being ordered in order to increase the defendant's own investment in his treatment and other services. Number three, you must not incur any new credit charges or open any lines of credit without the approval of your probation officer. This is being ordered based upon the defendant's conduct in this case particularly related to the

money laundering aspect. That is including the receipt of vehicle loans for fraudulent documents and laundered drug proceeds. This condition is being ordered to serve the statutory sentencing purposes of deterrence, public protection, and rehabilitation in this case. Number four, you must provide the probation officer with access to any requested financial information and authorize the release of any financial information. Probation office may share financial information with the U.S. Attorneys' Office as necessary based upon the defendant's conduct in this case, including the receipt of vehicle loans with fraudulent documents and laundered drug proceeds. This condition is ordered to help the probation officer deter and detect any future economic crimes.

Now, with respect to any recommendations, Ms. Odom, I believe you indicated that Mr. Lovett's child is in Charlotte; is that correct?

**MS. ODOM:** She's splits time between Charlotte and Spartanburg, Your Honor.

**THE COURT:** I believe that in order to make a recommendation as to assignment to try to get him as close as possible for family visitation, I imagine Edgefield would be as close as anything.

**MS. ODOM:** Yes, sir, Your Honor. I believe so. South Carolina and North Carolina are probably as good as

we're going to get.

THE COURT: All right. I'm going to recommend to the Bureau of Prisons that if possible the defendant be assigned to the FCI Edgefield for humanitarian reasons in order to allow for family visitation. Anything you need to add to that?

MS. SHERARD: Your Honor, I was just mentioning Bennettsville actually may be -- FCI Bennettsville may be the more common one for Greenville. Just throw that out there as another option in South Carolina.

THE COURT: Which would you prefer? Which would Mr. Lovett prefer, Ms. Odom?

(Whereupon, Ms. Odom confers with the defendant off the record.)

MS. ODOM: I'm no BOP expert, Judge. Let's say Edgefield for now. But honestly, as you heard me just tell him, I'm no BOP expert. So I will do some research after court today. Perhaps if that changes I'll let the Court know. But for right now let's say Edgefield.

THE COURT: It will likely be Monday before we get the written judgment, and I will say since the Fourth Circuit requires me to say while we're all here that it is my intention to recommend his placement at a location that is closest to the Greenville/Spartanburg/Charlotte area. And if the two of you determine that there is a BOP facility that he

would be qualified to be placed in that is closer than Edgefield, I will make that modification.

MS. ODOM: Thank you, Your Honor.

THE COURT: All right. I am going to go ahead and modify this at this time. My clerk informs me that Bennettsville is significantly nearer Charlotte than Edgefield. So based on that I'm going to make the recommendation for Bennettsville. But what I said still follows. If you-all find something that you think is closer, I will be happy to modify that. I'm also going to recommend because Mr. Lovett has shown a capacity for academic achievement and has certainly demonstrated a high level of intelligence, I'm going to recommend that he be allowed to be screened for and allowed to participate in any educational or vocational programming which he would like to participate in.

Are there any other treatment or programming recommendations the defense would like the Court to make?

MS. ODOM: No, sir, Your Honor.

THE COURT: All right. With that are there any -- well, let me first say, I believe that I have calculated the advisory guideline range properly in this case and correctly addressed all the points raised by the parties. However, if it is later determined that I have not, I will state for the record that I would have imposed this same sentence as an alternate variant sentence in light of all the 18 U.S.C.

Section 3553(a) factors, and in light of the totality of the circumstances present in this case.

And Ms. Odom, let me just ask you, I believe I have, but have I adequately addressed all of the issues that you have raised in connection with sentencing?

**MS. ODOM:** Yes, sir, Your Honor.

**THE COURT:** All right. Are there any objections or exceptions to the form of the Court's sentence from the government?

**MS. SHERARD:** No, Your Honor. Thank you.

**THE COURT:** Any from the defense?

**MS. ODOM:** No, sir, Your Honor.

**THE COURT:** All right. With respect to any other counts in which the defendant was named and with respect to the forfeiture, Ms. Sherard, what's the government's position?

**MS. SHERARD:** Your Honor, at this time we're moving to dismiss the remaining counts of the indictment, and we would request that the preliminary order of forfeiture be incorporated into the judgment.

**THE COURT:** Those counts will be dismissed and the order of forfeiture will be incorporated into the final judgment.

Now, Mr. Lovett, in your written agreement you entered into with the government, I believe it's paragraph 7 of that agreement, you entered into what we call an appellate

waiver. Basically what that says is that you acknowledged that you have certain rights as a criminal defendant to contest your conviction or sentence by way of a direct appeal or certain post conviction actions such as one brought pursuant to 28 U.S.C. 2255. That in exchange for the concessions that the government was making in that plea agreement, you agreed to waive your right to any direct appeal or post conviction action such as a 2255 action. That waiver has certain exceptions to it. It does not apply to claims of prosecutorial misconduct, ineffective assistance of counsel, or if the law were to change at some point after this during your sentence in a way that affected your sentence, you would be able to raise that.

If you believe that you have grounds to appeal this sentence and you wish to do so, and you believe that either those grounds fall within one of those exceptions or if you believe that they are otherwise outside the scope of that waiver, or if you believe for some reason that that waiver was invalid, whatever the reason is, if you believe you have grounds to appeal that are not barred by that waiver, you would need to file a written notice of appeal within 14 days from the entry of the written judgment. Now, as I said, it may be as late as Monday before that judgment gets entered. But to be on the safe side, you would need to file that with the Clerk of Courts office in Greenville within two weeks from

today. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I'm sure Ms. Odom has talked with you about your appeal rights. I'm going to direct her to do so again before you leave today so you don't have any questions about what you need to do if you wanted to do that.

All right. With respect to the defendant's bond status, Ms. Sherard, what is the government's position?

MS. SHERARD: Your Honor, I believe he's been in compliance for the 400 plus days he's been out. So we have no objection to him self surrendering.

THE COURT: Ms. Coleman, have there been any issues?

PROBATION OFFICER: None, Your Honor.

THE COURT: All right. Ms. Odom, I presume that you would move for voluntary surrender?

MS. ODOM: I would, Your Honor.

THE COURT: Okay. Mr. Lovett, let me tell you how this works. In order for me to allow you to remain out on bond pending your notification to report to the Bureau of Prisons, I have to make several findings. The first two are the same that the magistrate judge made when he assigned you bond, except I have a little bit more of a history to work with now. Those are, I need to make sure that you're not a risk of flight and that you don't pose a danger to the community. Based upon how you've behaved yourself during the

pretrial process of this case and even after you were convicted of these charges, I don't have any problem in finding that the evidence of your conduct is sufficient to show that you are not a risk of flight or pose a danger to the community such that bond should be revoked or you should be taken into custody. The harder issue is that as we talked about when you pled guilty, the nature of this charge falls within what the government calls a serious drug offense which brings you under a statute known as the Mandatory Detention Act for certain serious drug offenses or violent offenses, requires you to be taken into custody. Very limited exceptions to that. In your case I found that there were exceptional circumstances so as to satisfy that limited exception following your guilty plea and your conviction and allowed you to remain out on bond. For those same reasons I'm going to allow you to remain out on bond and voluntarily surrender when you are notified by the Bureau of Prisons.

Couple of things: First, you are under a sentence of this Court. If you violate any term or condition of your bond whatsoever, that violation will be brought to my attention, you'll be brought back in here, and absent something truly extraordinary that quite frankly sitting here I can't quite envision, you'll be taken into custody and you'll lose your right to be out pending your report date to the Bureau of Prisons. Understood?

THE DEFENDANT: Yes, sir.

THE COURT: Second thing, it is extremely important when you receive that letter notifying you of the date and time for you to report to the Bureau of Prisons, that you strictly comply with that. In other words, you need to be where they tell you to be and you need to be there early because if you're not there at the appointed time, you're going to be listed as failing to report, and that's going to create additional charges, and it's going to open up a whole can of worms that neither you nor I want to have to deal with.

So, what I'm telling you is, I can't control where they're going to assign you. I can make a recommendation, but space availability, your security level, there's all sorts of different things that can affect where they send you. It may be at some distance from here at least initially. If you believe you're going to have any difficulty whatsoever getting yourself to where you need to be, you need to immediately notify Ms. Odom, she can notify the Court, and we can make arrangements for you to surrender yourself to the U.S. Marshal Service here at a particular time, and they will take care of getting you where you need to be. And once you're in their custody, then you're covered. Understood?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Ms. Odom, anything else?

MS. ODOM: Nothing further at this time, Your Honor.

THE COURT: Anything else further from the government?

MS. SHERARD: No. Thank you, Your Honor.

THE COURT: Mr. Lovett, as I said earlier, I think you have tremendous potential. You are a young man who can pretty much do whatever he sets his mind to based on what I've seen here. You have a huge capacity for good based on how you've treated your friends and your family and the nice things that they say about you. And after doing this for almost eight years I feel like I'm a pretty good judge of when somebody is just saying that stuff because they think they're supposed to and when they really mean it. And I think you've got people who really mean it. You've got a young child who even with this sentence if you behave yourself, you earn good time credit, you get time off this sentence, you're going to be around before she gets fully grown. And that responsibility as a parent should be enough if there was nothing else to give you incentive to do what you need to do. But the fact that you can also be a great success, I believe, should also give you some incentive because you clearly know how to run a business. Next time it just needs to be a legal one.

THE DEFENDANT: Yes, sir.

THE COURT: All right. I wish you the best of luck. That will conclude this matter. We're going take a brief

recess before our next matter.  Thank you.

(Court recessed at 11:23 a.m.)

CERTIFICATE

I,  Michele E. Becker, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Michele E. Becker          Date:  12/26/2025